IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DELLA HERRERA,

        Plaintiff,

vs.                                    No.  07cv0809 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's (Herrera's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 16]**, filed on January 14, 2008, and fully briefed on March 6, 2008.  On October 24, 2006, the Commissioner of Social Security issued a final decision denying Herrera's claim for disability insurance benefits and supplemental security income payments.  Herrera seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is well taken and will be **GRANTED**.

### I.  Factual and Procedural Background

Herrera, now fifty-seven years old (D.O.B. January 22, 1951), filed her application for disability insurance benefits and supplemental security income payments on September 30, 2003

(Tr. 23), alleging disability since November 1, 2000[1] (Tr. 20), due to degenerative disc disease with radiculopathy, bilateral leg numbness, depression and hearing loss.  Herrera's insured status for disability insurance benefits expired on September 30, 2005.  Tr. 18.  Thus, Herrera must establish that she was disabled on or before that date.  *See Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir.1993).  Herrera has an eighth grade education and past relevant work as a clerk/cashier/manager, custodian and seamstress.  Tr.108 (Work History Report).

On October 24, 2006, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Herrera was not disabled as she had "a residual functional capacity compatible with the performance of a limited range of 'light' work."  Tr. 22.  At step four of the sequential evaluation process, the ALJ found Herrera was "capable of performing past relevant work as a clerk/cashier ."  *Id.*  In addition, the ALJ  found Herrera's allegations regarding her limitations "[were] not entirely credible."  *Id.*

On December 20, 2006, Herrera filed a Request for Review of the decision by the Appeals Council, along with additional evidence from her treating physician.  Tr. 14.[2]  On May 12, 2007, the Appeals Council denied Herrera's request for review of the ALJ's decision.  Tr. 7.  Hence, the

---

[1]  In her Disability Report Adult, Herrera reported her "illnesses, injuries or conditions first bothered [her] on November 1, 2000 and she was "unable to work because of [her] illnesses, injuries or conditions" on December 18, 2000.  Tr. 117.  The Court notes the Agency lists December 20, 2001, as the  "Date of Onset" since Herrera "stopped working" on that day.  Tr. 97.  However, at the Administrative Hearing, Herrera testified she stopped working after June 2001.  Tr. 290.

[2]  Although the new evidence was not before the ALJ, it was before the Appeals Council.  Tr. 7.  Therefore, the Court must consider it when evaluating the Commissioner's decision for substantial evidence.  *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)(new evidence becomes part of the administrative record to be considered by the Court when evaluating the Commissioner's decision for substantial evidence).

decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Herrera seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  The court "may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Herrera makes the following arguments: (1) the ALJ's RFC finding is unsupported by substantial evidence; (2) the ALJ's RFC determination that she could perform her past relevant work is unsupported by substantial evidence; and (3) the ALJ's credibility finding is unsupported by substantial evidence.

## A.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id.* at 1.  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved."  *Id.* at 7.  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence."  *Id.*

Herrera contends the ALJ's RFC determination is not supported by substantial evidence. Specifically, Herrera contends that although the ALJ "completely rejected" the opinions of Drs.

5

Singleton and Baten, the ALJ failed to weigh their opinions using the six factors set forth in the regulations." Mem. in Support of Pl.'s Mot. to Reverse at 11. Additionally, Herrera argues the ALJ's rationale for rejecting the opinions of these physicians is "contaminated by her understatement of the January 2006 lumbar MRI." *Id.*

In her decision, the ALJ found Herrera had severe impairments in the form of degenerative disc disease with right leg radiculopathy, obesity, and a history of alcohol dependence. Tr. 20. In regards to Herrera's RFC, the ALJ found:

> After careful consideration of the entire record, I find that Ms. Herrera has a residual functional capacity compatible with the performance of a limited range of "light work." In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. I also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p and 96-6p.
>
> Ms. Herrera began reporting back pain with lower extremity symptoms in 2001 and she has an excessive weight to height ratio. X-rays were done in early 2002 which disclosed what were described as modest degenerative changes of the lower lumbar spine with mild narrowing of the disc spaces at several levels (Exhibit 1F24). Ms. Herrera continued to report back and leg pain and sought General Assistance as she felt she was unable to work. A nurse practitioner recommended further evaluation of her complaints noting that the physical findings were minimal (Exhibit 1F2). Ms. Herrera was given a consultative physical examination in April 2004 by W. Ryan, M.D. Dr. Ryan's report concludes that Ms. Herrera had a "pretty normal physical exam" (Exhibit 2F2).
>
> In August 2004 Ms. Herrera returned to her treating facility after an eleven month absence (Exhibit 6F16). She reported experiencing muscle spasms in the right hip and was given an injection which did not moderate her complaints (Exhibit 6F11). In June 2005 Ms. Herrera attended a follow up visit and appeared in no apparent distress. She exhibited some tenderness over the sciatic notch and physical therapy was recommended. **In early 2006 she was given an MRI which found narrowing of the right lateral recess and a mild diffuse disc bulge at L5-S1** (Exhibit 6F2). T. Singleton, M.D. has submitted [a] medical source statement indicating that Ms. Herrera is unable to sit, stand, or walk; lift or carry over five pounds; use her hands and feet; or perform most postural activities (Exhibit 6F5). M. Baten, M.D. examined Ms. Herrera on one occasion and has submitted a report in her behalf. He reported that her examination was normal but goes on to describe how her symptoms would significantly interfere with the ability to engage in work related activities (Exhibit 7F).

Ms. Herrera testified that her bones were too deteriorated to be fixed. She said that she lays down most of the time due to sitting, standing, and walking intolerances. Ms. Herrera contended that she had no strength in her left arm and could not grasp or conduct fine manipulation with her right hand. She said that she had bad knees and could only climb two or three steps (testimony).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The objective findings in this case do not reasonably translate into the significant subjective complaints and functional limitations reflected in Ms. Herrera's hearing testimony. She has a very conservative treatment history, has gone for lengthy periods without seeing a physician, and has been consistently counseled regarding diet and exercise. Dr. Ryan found no significant problems. Nor did Dr. Baten, whose opinions seem extrapolations based on Ms. Herrera's self reports regarding her symptoms. Dr. Singleton's statement portrays Ms. Herrera as essentially incapacitated and unable to use her hands although she has no medically determinable impairment which would impose such limitations. Accordingly, I reject the opinions of Dr. Singleton and Baten as exaggerative and inconsistent with the objective findings. Ms. Herrera has a potentially pain producing impairment and her subjective complaints are not completely discounted. However, a reasonable evaluation of the evidence as a whole results in a finding that Ms. Herrera has a residual functional capacity compatible with the performance of a limited range of "light" work. Specifically, she is able to lift ten pounds frequently and twenty pounds occasionally; to sit four cumulative hours per workday; walk four cumulative hours per workday and stand six cumulative hours per workday. Ms. Herrera should not be expected to push/pull with her lower extremities or climb, stoop, kneel, or crouch more than on an "occasional" basis. She has no discernable manipulative; communicative; visual; or environmental limitations.

Tr. 21-22 (emphasis added).

The January 2006 lumbar spine MRI results indicate the following significant findings:

At the level of L5-S1, there is mild diffuse <u>disk bulge with focal disk protrusion in the right paracentral region causing **severe narrowing** of the right lateral recess. It is seen pretty **close to the right S1 nerve root and probably impinging on that nerve root**</u>. Clinical correlation is recommended. Mild narrowing of disk space at L5-S1 level is also seen.

Tr. 241 (emphasis added). In her decision, the ALJ noted the 2006 MRI of the lumbar spine but failed to mention that the narrowing of the right lateral recess was severe and close to the right S1 nerve root, probably impinging on that nerve root. The 2006 MRI also recommended "clinical correlation." Tr. 242.

On February 2, 2006, Tamara Singleton, M.D., Herrera's treating physician, evaluated

Herrera and correlated the MRI results with her objective findings.  Dr. Singleton noted:

S:      Della Herrera is a 55-year-old woman who comes in for a follow up on leg pain.  It
        is worse on the calf in the back of her leg and her buttock and seems to be in a sciatic
        nerve distribution.

O:      On physical exam, she looks uncomfortable.  Her temp is 98.2, pulse 60, respiration
        is 20, and blood pressure 120/70.  She weighs 173 lbs, and O2 sat[uration] is 97%
        on room air.  I reviewed her recent MRI, which shows some severe narrowing of the
        right lateral recess of her L5-S1 disk and this is impinging on her sciatic nerve root.

A:      This can get better with surgery but makes sense to try physical therapy first.

P:      I have given her ibuprofen 800 mg t.i.d., which has helped in the past.  I have given
        her trazodone refill, she takes 25 h.s. for sleep.  She also has good luck with
        acetaminophen 500 mg 1 tablet q.4h. p.r.n. and I have referred her to Rocky
        Mountain Orthopedic for physical therapy.  She says her ears were buzzing but they
        look normal to me and when I examined them, so mostly today I am treating her
        sciatic pain.  I also discussed her case with one of our local neurosurgeons to see if
        they thought surgery would be more imminent.  Ms. Herrera also needs to follow up
        for her routine well woman check as the Neurontin that I prescribed does not seem
        to be working.  We can discontinue that at this time, and I have ordered some routine
        labs for her.

Tr. 246 (emphasis added).

On March 3, 2006, Dr. Singleton completed a Physical Capacities Evaluation.  Tr. 244-

245.  Dr. Singleton opined Herrera could not sit, stand or walk for an hour total at a time, and

could sit for 2 hours, stand for 1 hour, walk for 1 hour and lie down for 3 hours in an 8-hour

workday. Tr. 244.  Dr. Singleton also opined Herrera could occasionally lift up to 5 lbs but never

lift anything heavier; could occasionally carry up to 5 lbs but never carry anything heavier, could

never repetitively grasp with either hand, could never repetitively push or pull arm controls, could

never repetitively engage in activities requiring fine manipulation; could never repetitively push or

pull leg controls with her either or both legs; could occasionally bend and reach but could never

squat, crawl or climb; and had only mild restrictions working in unprotected heights. The ALJ
rejected Dr. Singleton's RFC assessment.

Other visits to her physicians support Herrera's complaints over several years.[3] The
record reveals the following relevant medical information:

On April 3, 2001, Herrera went to LCDN (Las Clinicas Del Norte) for her annual
gynecological examination. On that day, she complained of "numbness on both legs." Tr. 209.

On May 1, 2001, Herrera went to LCDN with complaints of leg pain. Tr. 206. Herrera
reported a history of "cramping sensation to the right hip and leg for past 3-4 years." *Id*. Herrera
also reported experiencing "nocturnal numbness to the right leg." *Id*. The physician assistant
noted Herrera had started a low fat diet and was walking for one hour every day. The physician
assistant assessed Herrera with "rt leg pain – ? sciatica." *Id*.

On August 21, 2001, Herrera went to LCDN with complaints of bilateral leg pain. The
physician assistant noted Herrera "continued to complain [of] sciatic type [illegible] aggravated by
walking; radiates into both legs." Tr. 204. The physician assistant assessed Herrera with chronic
low back pain and ordered lumbar spine x-rays to check for degenerative changes.

On February 5, 2002, Herrera went to LCDN with complaints of "numbness to rt. leg–
began 2 years ago in the area of the buttocks – radiates into the post[erior] thigh; has occasional
burning to the ant[erior] calf." Tr. 202. The physician assistant examined Herrera and noted
"positive mild tenderness over the sciatic notch." *Id*. The physician assistant assessed Herrera
with sciatica.

---

[3] In the Disability Report Adult, Herrera reported she experienced "pain on right calf to
hip, left leg numb around thigh and lower back pain." Tr. 117.

On February 26, 2002, Herrera went to LCDN with complaints of rash over her upper body and left upper leg pain.  Tr. 193.  The physician assistant tended to her rash but also noted "follow up sciatica."  *Id.*

On March 20, 2002, Herrera underwent lumbar spine x-rays for "increasing low back pain."  Tr. 192.  The lumbar spine x-rays indicated "mild narrowing of the disc spaces of L3-4, L4-5, and L5-S1."  *Id.*

On October 1, 2002, Herrera went to LCDN and requested "temporary disability so she [could] get GA (general assistance) to investigate chronic pain."  Tr. 171.  Herrera reported that standing caused pain in her right hip which radiated to her calf, and she had chronic lower back pain which was aggravated by sitting.  Herrera informed the nurse practitioner that she had been experiencing these symptoms for about three years.  The nurse practitioner examined Herrera and noted Herrera had a positive SLR (straight leg raise test– indicating sciatic nerve root compromise) of the right leg, 1+ of her DTRs (deep tendon reflexes)(2 is normal), and 1+ ankle jerk (neural pathway for this reflex is S1-2).  The nurse practitioner assessed Herrera with chronic back and leg pain.

On June 18, 2003, Herrera went to LCDN with complaints of dizziness and ringing in ear.  Tr. 183.  Herrera also reported that for the past five years she had experienced intermittent right leg pain affecting her calf and shooting up to her right low back.  Herrera was treating her pain with Tylenol (up to 2gm per day) without relief.  The physician examined Herrera and noted a positive "straight leg test."  The physician assessed Herrera with DJD/LBP, noting "some sciatic nerve compression."  The physician also noted Herrera needed further work-up, "EMG  vs. imaging in future."

On August 12, 2003, Herrera went to LCDN complaining of back and leg pain.  Tr. 175.
Herrera complained she had been spending most of her time in bed.  Herrera reported a past
history of chronic back pain with right sciatica for two years. On that day, Herrera complained
that she had lost her job due to her need to sit often.  Herrera complained of burning pain in her
left lateral thigh and shooting pain right buttock to her ankle when she stood for more than 20
minutes.  The nurse practitioner examined Herrera and noted a "very antalgic gait," "tender
paraspinals in low lumbar region."  The nurse practitioner assessed Herrera with "chronic sciatica
(R)."

On August 31, 2004, Herrera returned to LCDN for "back and leg pain."  Tr. 255.  The
physician noted Herrera was "here after 11 month absence."  *Id.*  Herrera had lost 20 lbs "because
Joan (nurse practitioner) told her to do so."  *Id.*  Herrera reported she was taking 4 Tylenol every
day.  Herrera also reported she felt a hot sensation over her left lateral thigh and felt like her legs
would give way.  The examination revealed Herrera used her arms to lift herself from a sitting
position, she had an unsteady gait, experienced increased pain when she stood and attempted the
heel/toe test and was unable to walk on her heels or toes.  The exam also revealed pain over the
lumbar spine and paraspinal muscles, pain over the right piriformis muscle (implicated in some
cases of sciatica nerve neuralgia), and a positive straight leg raise test on the right leg.  The
physician assessed Herrera with chronic lower back pain with sciatica and with neurological
symptoms.  The physician prescribed Naproxen (nonsteroidal anti-inflammatory drug) 550 mg
twice a day with food and noted he would consider funding for an MRI and a neurological
referral.

11

On November 23, 2004, Herrera returned to LCDN for "pain on right let, lower back pain." Tr. 252. Herrera rated her pain a 9 on a 10 point scale. The nurse practitioner noted the pain had been ongoing for one week, pain was in her "right hip and post[erior] right thigh," with no history of trauma or falls. The physician assistant also noted Herrera had a history of sciatica. On examination, the physician assistant noted Herrera was in obvious distress with difficulty ambulating, and had pain to palpation at the right iliac spine. The physician assistant assessed Herrera with muscle sprain and right hip sciatica. He prescribed Robaxin (muscle relaxant) 1.5 g every 6 hours as needed for seven days, Toradol (nonsteroidal anti-inflammatory drug) 30 mg intramuscularly and directed Herrera to return if she experienced no improvement.

On November 30, 2004, Herrera returned to LCDN for a follow up "regarding pain on the right leg, persistent rated 8/10." Tr. 250, 251. The nurse practitioner  noted:

S:      The patient returns to the clinic one week after having been evaluated by myself for muscle spasm on the right hip attributed to sciatica. At that time, we have injected the patient with Toradol IM and given her a seven-day supple of Robaxin 1.5 g q6h p.r.n. The patient states that she experienced relief only for the 24 hours following the Toradol injection and experienced relief for about three hours with the Robaxin. However, she is still now unable to sleep at night and still in moderate to severe degree of pain, which is on the right hip, the posterior right thigh, and the lumbar back.

Current Medication:      She is on methocarbamol, stating no side effects.
Social Hx:               She is a smoker of 1-3 cigarettes a day.

O:      This is a Hispanic female, middle-aged, in obvious pain, and with associated difficult ambulation. Again, there are no bony malformations and there does not appear to be any skeletal or hip anomalies. There is no rotation, inversion or shortening of the affected extremity. There is pain to the right iliac spine. All this is consistent with the previous visit and with previous ones before that. Several visits to the clinic attributed to the same. The patient is currently awaiting financial assistance to have her diagnostics obtained.

A:      **Right sciatica.**

P:      I have discussed with the patient in turning motion, given the relief that she experienced with the intramuscular Toradol. I would have preferred to give her the

> oral form of it; however, **she is not able to afford it at this time.**  I have given
> her the injection again and given her ibuprofen at a dose of 600 mg, which I
> recommended to use q8h p.r.n.  I have also give her Robaxin 1.5 g for an
> additional 14 days.  She states understanding and agreement with the plan of
> care.

*Id.* (emphasis added).

On June 15, 2005, Herrera returned to LCDN for a follow up of her sciatica.  Tr. 249.

Herrera reported her pain was 5 on a scale of ten.  Dr. Singleton examined Herrera and noted

tenderness over the sciatic notch, assessed Herrera with sciatica, and prescribed methocarbamol

(muscle relaxant), Trazodone (used for depression or chronic pain), and stressed Herrera get

physical therapy.

On June 30, 2005, Herrera returned to LCDN for a follow up of her laboratory work.  Tr.

248.  Notably, Dr. Singleton recorded a "gradual weight loss since 07/03."  *Id.*

On December 21, 2005, Herrera went to LCDN with complaints of "moderate to severe

pain on both legs and lower back."  Tr. 247.  Dr. Singleton noted "neuropathic pain right leg." *Id.*

Dr. Singleton assessed Herrera with "suspect radiculopathy or stenosis" and ordered an MRI.  Tr.

247.  Dr. Singleton prescribed neurontin 200 mg twice a day and noted "may help get funding for

MRI."  *Id.*

Based on the evidence as a whole, the ALJ erred in understating the January 2006 lumbar

spine MRI and selectively noting only the part of the MRI results that supported her decision.

*See Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir. 2004)("The ALJ may not pick and

choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts

favorable to a finding of disability.").  Herrera's complaints of increasingly back and leg pain and

her health care providers' assessments that she may have impingement of the sciatic nerve were

confirmed by the 2006 lumbar spine MRI.  Moreover, the medical evidence is consistent with her

complaints.

The ALJ also rejected Dr. Baten's Physical Capacities Evaluation.  Dr. Baten is a

neurologist.  Generally, the ALJ must give more weight to a specialist about medical issues

related to his or her area of specialty than to the opinion of a source who is not a specialist.  *See*

20 C.F.R. §§ 404.1527(d)(5) & 416.927(d)(5).  Dr. Baten evaluated Herrera and found her to be

a reliable historian.  Tr. 262-263.  Dr. Baten assessed Herrera with chronic lumbar strain and

sciatica.  Dr. Baten recommended a lumbar epidural steroid injection.  However, after examining

Herrera, Dr. Baten also noted seeing "nothing focally amiss."  Tr. 263.  Nonetheless, in response

to a letter from Herrera's representative, Dr. Baten provided the following information in a letter

dated May 24, 2006.

> I am responding to your May 9th letter regarding Dela (sic) Herrera.  I evaluated Ms. Herrera
> on 05/09.06.  <u>My answers to the questions posed in your May 9th letter are predicated on that
> visit</u>.  They will be answered in the order as rendered.
>
> 1)     The patient was examined by me on 05/09/06.  Diagnosis based on that evaluation
>          was a chronic lumbar strain and sciatica.  <u>Her examination was normal</u>.
>
> 2)     The patient is experiencing intractable pain in her lower back characterized by a deep
>          aching pain which is there almost on a continuous basis with radiating pain down her
>          left leg.  Such symptoms would prevent the patient from engaging in jobs that require
>          her to sit most of the time during an eight hour work day and which would exacerbate
>          her pain.  These would also interfere with ability to focus, concentrate, stay on tasks,
>          obey orders from supervisors and relate appropriately to coworkers.  Sitting would
>          worsen her symptomatology.
>
> 3)     The pain and symptoms that Ms. Herrera related would not allow her to engage in a
>          job which requires her to push or pull, to use her legs for control while seated.  In
>          addition, she would have problems both standing and walking due to the pain.  These
>          positions mechanically worsen her pain.
>
> 4)     The above symptoms and findings would prevent her from climbing, stooping,
>          kneeling, crouching, falling repetitively throughout an eight hour work day.

14

5)    The symptoms she is experiencing are constant and this is independent of whether she is sitting, standing, or walking.

6)    The patient would have difficulty due to her chronic pain to respond appropriately to supervisors, coworkers and to deal with usual work pressures, even in a sedentary job setting.

7)    <u>I believe that the complaints of Ms. Herrera are credible</u>.

8)    I believe that these symptoms have persisted since November 1, 2001.

9)    The pain would not necessarily interfere with her use of her hands for repetitive activities although lifting and carrying objects certainly might.  This is related to mechanical stress on her back.

10)   The above conditions are permanent and are expected to last at least 12 months.

11)   In an eight hour day it would be likely that Dela (sic)Herrera would find it necessary to lay down, possibly place her feet on a stool and this would correspondingly result in her inability to work fully during an eight hour work day.

12)   Driving, because of the seated position would be adversely by her current condition.  This is due, again, to mechanical stress on her lower back.

I hope this information is helpful to you.  Contact me please if you have further questions.  The completed physical capacity evaluation is enclosed.

Tr. 264-265 (emphasis added).

Dr. Baten also completed a Physical Capacities Evaluation.  Tr. 260-261.  In the Physical Capacities Evaluation, Dr. Baten opined Herrera (1) could sit, stand and walk 1 hour at one time; (2) sit, stand and walk 2-3 hours in an 8-hour day; (3) frequently lift and carry up to 5 lbs.; (4) occasionally lift and carry from 6 to 20 lbs.; (5) could use her hands for repetitive actions such as simple grasping, pushing and pulling of arm controls and fine manipulation; (6) could not use her feet for repetitive movements as in pushing and pulling of leg controls; (7) could not bend, squat, crawl, climb, or reach; and (8) was restricted of activities involving unprotected heights and being around moving machinery.  *Id.*

15

Dr. Baten's physical examination indicated Herrera had "limited lumbar flexion" and "tightness in the lumbar area."   Tr. 263.   The physical examination also indicated 1+ reflexes in the lower extremities.   Tr. 262.   Moreover, Dr. Baten reviewed the January 12, 2006 lumbar MRI and noted Herrera had "some disc disease and some impingement" at the L5-S1 level, and "some degenerative disc seen and bulging disc at L4-5."   *Id.*   Notably, Dr. Baten found Herrera to be credible.

Under the regulations, the ALJ had a duty to seek clarification from Dr. Baten because there was a conflict or ambiguity in his medical report.   *See* 20 C.F.R.   §§404.1512(e)(1) and 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").   Although Dr. Baten noted Herrera's examination was normal, his medical notes indicate some abnormal findings and his review of the January 2006 lumbar spine MRI shows he found it to be abnormal.   Dr. Baten also recommended Herrera undergo a lumbar epidural steroid injection. Significantly, the Physical Capacities Evaluation completed by Dr. Baten indicates Herrera has serious physical limitations.   Dr. Baten may have relied on the MRI results for his opinion given that his examination was not that remarkable.   The ALJ needs to make this inquiry.

In her decision, the ALJ rejected Dr. Baten's opinions due to the ALJ's concern that those opinions "seem[ed] extrapolations based on Ms. Herrera's self reports regarding her symptoms." Tr. 22.  Because the medical records as a whole support Herrera's complaints, the Court will remand this action to allow the ALJ to seek clarification from Dr. Baten and redetermine

Herrera's RFC.  However, the Court expresses no opinion as to the extent of Herrera's impairment or whether she is or is not disabled within the meaning of the Social Security Act. The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

In her decision, the ALJ noted Dr. Ryan's consultative examination.  Dr. Ryan is an internist and evaluated Herrera on April 13, 2004.  Significantly, Dr. Ryan did not have the January 2006 lumbar spine MRI before him for review.  On June 18, 2004, Herrera completed a Disability Report Appeal.  Tr. 142-148.  In her appeal, Herrera complained that Dr. Ryan's examination took five minutes, noting "he **'looked' !!** at my ankles, elbows, hands, checked hearing.  That was the whole exam."  Tr. 143.  The ALJ relied on Dr. Ryan's examination. Specifically, the ALJ noted, "Dr. Ryan found no significant problems."  Tr. 22.  Because Dr. Ryan did not have an opportunity to review the lumbar spine MRI and because Herrera alleges Dr. Ryan did not examine her, the ALJ should consider ordering another consultative evaluation if necessary.  On remand, if the ALJ finds it necessary to order another consultative evaluation, she should consider a physiatrist.

**B.  Credibility Determination**

Finally, there are numerous entries which reflect Herrera's inability to pay for her health care which would account for her "conservative treatment" and her "lengthy periods without seeing a physician."  Although the ALJ noted Herrera "ha[d] been consistently counseled regarding diet and exercise," the ALJ never mentioned that in 2001, Herrera was on a low fat diet and was walking for one hour every day, and in August 2004, Herrera had lost a significant amount of weight.  In making her credibility finding, the ALJ should have followed the factors set

17

forth in *Thompson*.  *See Thompson*, 987 F.2d at 1490 ("[B]efore the ALJ may rely on the claimant's failure to pursue treatment or take medications as support for his determination of noncredibility, he or she should consider (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and if so, (4) whether the refusal was without justifiable excuse.")(internal quotations omitted).  On remand, the ALJ should reconsider her credibility finding.[4]

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

---

[4] The ALJ's finding that Herrera did not have a severe mental impairment is supported by substantial evidence and thus affirmed.  Under the regulations, Dr. Gzaskow is considered a nontreating source.  *See* 20 C.F.R. §§404.1502 & 416.902.  However, "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . ."  *See* SSR 96-6p, 1996 WL 374180, at *2. The ALJ accorded Dr. Gzaskow's opinion the proper weight.  Herrera's medical records do not indicate that she sought mental health treatment.  In addition, Herrera did not mention having any mental health issues at the administrative hearing.